UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CRIMINAL ACTION NO. 1:18-CR-00026-GNS

UNITED STATES OF AMERICA                                                          PLAINTIFF

v.

DAMONE DOMONIQUE BELL                                                         DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff's Objection (DN 49) and Defendant's Objection (DN 50) to the Magistrate Judge's Findings of Fact, Conclusions of Law, and Recommendation (DN 45), and Plaintiff's Motion for Leave to Seal Exhibit (DN 36). For the following reasons, the Court **ADOPTS IN PART** and **REJECTS IN PART** the Magistrate Judge's Report and Recommendation ("R&R"), **SUSTAINS** Plaintiff's Objection, **OVERRULES** Defendant's Objection, and **GRANTS** the motion to seal.

### I. SUMMARY OF RELEVANT FACTS

This matter arises from the arrest, search, and interrogation of Defendant Damone Domonique Bell ("Bell"). On July 30, 2018, Logan Cesler ("Cesler") purchased one-half gram of heroin for use by himself and Kaitlin McKinney ("McKinney"). (R&R 2, DN 45). McKinney fatally overdosed after using this heroin. (R&R 2). After investigators reviewed security footage, Cesler's testimony, and text message conversations, they identified Bell as a suspect in the sale of the heroin to Cesler. (R&R 2).

While the exact timing of the photo identification is uncertain,[1] on July 31, 2018, Cesler identified Bell in a photograph lineup of six people as the one who sold him heroin on the previous evening. (R&R 2). Cesler then texted the suspect on direction by the police to set up another drug purchase. (R&R 2). When Bell arrived near the identified meeting point, he was arrested and taken into custody. (R&R 2). Upon approaching Bell's vehicle, officers reported smelling marijuana and a drug-sniffing canine officer signaled the presence of narcotics in the automobile. (R&R 2). As such, the police searched Bell's vehicle and discovered marijuana and heroin. (R&R 2).

Once at the station, Bell was questioned by Bureau of Alcohol, Tobacco, Firearms and Explosives Special Agent David S. Hayes and Bowling Green Police Department Officer Clifton Phelps. (R&R 3). Bell was read his *Miranda* rights, and he signed a waiver acknowledging those rights and his willingness to continue with questioning. (R&R 3). Fourteen minutes and 45 seconds into this interview, Bell said: "I don't want to be like a jerk or anything but can I . . . I really . . . can I just not say anything . . . else? Like I really don't know what to say. It's nothing, like I said, it is what it is. There's nothing really. There's no fixing it." (Pl.'s Suppression Hr'g Ex. B, at 14:45-15:00). The officers continued questioning him. Eighteen minutes and fourteen seconds into the interview, Bell stated, "You said I have the option to remain silent, right? I'm trying to remain silent. I'm not trying to be a jerk or anything, I'm just trying to remain silent." (Pl.'s Suppression Hr'g Ex. B, at 18:14-18:21). Shortly after this exchange, the officers ceased their questioning of Bell and ended the interrogation. (Pl.'s Suppression Hr'g Ex. B, at 20:30).

---

[1] It is unclear based on the witness testimony and exhibits whether Cesler positively identified Bell before or after Cesler witnessed Bell's arrest.

## II.     PROCEDURAL HISTORY

Bell has moved to suppress: (1) physical evidence seized during the search of his automobile; (2) statements made while in police custody; and (3) photographic and in-court identification. (Def.'s Mot. Suppress, DN 33; Def.'s Mot. Suppress, DN 34). The United States responded. (Pl.'s Resp. Def.'s Mot. Suppress, DN 35; Pl.'s Resp. Def.'s Mot. Suppress, DN 37). The Magistrate Judge conducted an evidentiary hearing on the motions and issued his Findings of Fact, Conclusions of Law, and Recommendation. Specifically, the Magistrate Judge recommended that the motion to suppress physical evidence be denied, the motion to suppress statements made after the 14:45-minute mark be granted, and the motion to suppress photo identification be denied. (R&R 11).

## III.     DISCUSSION

### A.     Motions to Suppress

A magistrate judge's report and recommendation on dispositive motions, such as a motion for the suppression of evidence, is subject to de novo review by the district court. *United States v. Curtis*, 237 F.3d 598, 603 (6th Cir. 2001).

#### 1.     *Bell's Stop, Arrest, and the Search of his Automobile*

Bell objects to the Magistrate Judge's finding that the police had reasonable suspicion to stop him, arrest him, and search his automobile. (Def.'s Obj. R&R 7, DN 50). Specifically, Bell takes issue with the Magistrate Judge's characterization of Bell as being apprehended at the "agreed upon location." (Def.'s Obj. R&R 7; R&R 4). The defense argues that because Bell drove *past* the meeting point, his proximity to the meeting point should not support a finding of reasonable suspicion or probable cause. (Def.'s Obj. R&R 8-9).

An investigatory stop of a vehicle is permissible when supported by reasonable suspicion that a crime has or is being committed. *Terry v. Ohio*, 392 U.S. 1, 22 (1968). The detaining officers must have a reasonable suspicion based on a "particularized and objective basis" as reviewed under the "totality of the circumstances." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). An automobile can be searched without a warrant if the officer has probable cause to believe that a crime has been or is in the process of being committed. *Carroll v. United States*, 267 U.S. 132, 158 (1925).

The United States here has more than met its burden. As thoroughly analyzed by the Magistrate Judge, Cesler described his drug purchase transaction with the suspect and provided a physical description of Bell and his automobile. This story was further verified by nearby security cameras. Moreover, Cesler's phone revealed drug-related text message conversations with a number linked to Bell. This number was then used to lure the suspect to a meeting point for another drug transaction. It was near this meeting point that Bell was ultimately stopped and then arrested. After the arrest, officers reported smelling marijuana and a canine officer alerted for drugs in the vehicle.

Under the totality of the circumstances it is clear to this Court, as it was to the Magistrate Judge, that the officers acted under particularized, reasonable suspicion when stopping Bell's vehicle. The officers then had sufficient probable cause based on the above-stated facts to arrest Bell and search his vehicle. Based on this overwhelming evidence, it matters little whether Bell was arrested *at* the agreed upon location or *near* the agreed upon location as described by Bell. Moreover, Bell's characterization of the facts is not wholly accurate. Based on text messages conversations between Cesler and the suspect, it appears the meeting location was in flux up to the

time of Bell's arrest.² As such, any argument that reasonable suspicion was diminished because Bell drove *past* a purported set meeting point is without merit.

## 2. *Bell's Interrogation by Police*

The United States objects to the Magistrate Judge's finding that Bell invoked his right to remain silent 14 minutes and 45 seconds into his interrogation. (Pl.'s Obj. R&R 5, DN 49). Specifically, the United States argues that Bell's question to police fell short of an unambiguous, unequivocal invocation of his right to remain silent. (Pl.'s Obj. R&R 5). The United States does not contest that Bell invoked his rights 18 minutes into the interview. (Pl.'s Obj. R&R 5).

It is axiomatic that a suspect subject to custodial interrogation has the right to remain silent. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Any statement made during custodial interrogation is inadmissible at trial unless the prosecution demonstrates that the suspect knowingly and voluntarily waived his rights. *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). A suspect can invoke his right to remain silent after questioning has begun, but he must do so unambiguously. *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010). When a suspect has invoked his right to remain silent, questioning must immediately cease. *Miranda*, 384 U.S. at 444. But, when a suspect's invocation of his Miranda rights is ambiguous or equivocal, the police have no obligation to clarify

---

² The text message conversation between Cesler and the suspect just before the arrest of Bell reads as follows:

> Cesler: "I'm at Hucks, what about Roses?"
> Suspect: "Come a little further down and turn left at the Waffle House[.]"
> Cesler: "Meet at Waffle House?"
> Suspect: "Turn left at the waffle house then Pass it up you're gonna see me. Just follow me[.]"

(Pl.'s Suppression Hr'g Ex. 7, at 3).

whether the suspect is indeed invoking his rights. *See Davis v. United States*, 512 U.S. 452, 461 (1994) (discussing a suspect's ambiguous invocation of his right to counsel).

Before any questioning commenced, Bell was read his *Miranda* rights in full and signed a *Miranda* rights waiver form. Prior to signing, Bell verbally acknowledged that he understood these rights. He then proceeded to answer the questions of the officers. As such, Bell knowingly and voluntarily waived his *Miranda* rights. The defense's arguments to the contrary—that Bell was handcuffed, that Bell had never heard his *Miranda* rights before, that Bell did not read the rights himself, and that the officer read these rights too quickly—do not counteract Bell's clear statement that he understood his rights and his voluntary choice to both sign the waiver and continue with the interview. (Def.'s Obj. R&R 9-12).

Next, the United States is correct that Bell's question to police regarding his right to remain silent was not an unambiguous assertion of this right. As noted, 14 minutes into the interview, Bell asked: "[C]an I just not say anything . . . else?" However, rather than remaining silent, Bell continued speaking: "Like I really don't know what to say. It's nothing, like I said, it is what it is. There's nothing really. There's no fixing it." Notably, this language—"There's no fixing it."—is arguably incriminating. It is hard to conclude that Bell *unambiguously* invoked his right to remain silent while immediately continuing to incriminate himself. If anything, this exchange with police demonstrates Bell's understanding of his rights and the efficacy of the *Miranda* warnings in this situation. Instead of clearly invoking his right to remain silent, however, Bell continued to answer questions for roughly three additional minutes. In the meantime, the officers had no obligation to clarify whether Bell wished to remain silent.

Moreover, Bell's question to police at the fourteen-minute point of the interview is markedly different from his unambiguous assertion of his right at eighteen minutes: "I'm trying

6

to remain silent. I'm not trying to be a jerk or anything, I'm just trying to remain silent." Again, this unambiguous invocation of his right to remain silent 18 minutes into the interview demonstrates that Bell understood this right and chose not to invoke it until that point in the conversation.³

Other courts have similarly concluded that questions alone are insufficient to invoke *Miranda* rights. In the seminal case of *Davis v. United States*, the Supreme Court held that the suspect's statement, "[m]aybe I should talk to a lawyer" was not an unambiguous request for counsel. *Davis*, 512 U.S. at 462. Likewise, in *United States v. Delaney*, 443 F. App'x 122 (6th Cir. 2011), the Sixth Circuit held that a suspect's question—"I think I should talk to a lawyer, what do you think?"—was not an unambiguous invocation of the right to remain silent. *Id.* at 130. In *Cornelison v. Motley*, 395 F. App'x 268 (6th Cir. 2010), the Sixth Circuit held that the Kentucky Supreme Court did not incorrectly conclude that "[w]hat if I want my lawyer present first?" was not sufficiently unambiguous. *Id.* at 274. In short, a question is simply not an unambiguous assertion of one's rights as the Supreme Court requires.⁴ While the Magistrate Judge is correct that there is no "shibboleth that a defendant must recite to invoke his constitutional rights," a defendant must still *actively* invoke them. Bell's question and the surrounding statements here simply do not meet this standard.

---

³ The contested statements following Bell's questionable attempt to invoke his *Miranda* rights appear to be of minimal significance given that prior to this exchange Bell explicitly admitted to details of his sale of heroin to Cesler the previous day, including the quantity and price.
⁴ There are numerous other cases dealing with this very fact-specific issue. *See, e.g.*, *Rogers v. Kerns*, 485 F. App'x 24, 31 (6th Cir. 2012) (holding in habeas review that "I can't write this with a lawyer or anybody[?]" was not unambiguous); *Diaz v. Senkowski*, 76 F.3d 61, 63 (2d Cir. 1996) (holding in habeas review that "I think I want a lawyer . . . Do you think I need a lawyer?" was not unambiguous); *United States v. Mullikin*, 534 F. Supp. 2d 734, 743 (E.D. Ky. 2006), *aff'd*, 267 F. App'x 456 (6th Cir. 2008) (holding that "I think I might need a lawyer" was not unambiguous). *But see Kyger v. Carlton*, 146 F.3d 374, 379 (6th Cir. 1998) (holding that "I'd just as soon have an attorney" was unambiguous).

The U.S. Supreme Court's unambiguous invocation rule is intended to avoid situations like the present case where a suspect's intention is unclear. In *Berghuis*, the Supreme Court reasoned:

> There is good reason to require an accused who wants to invoke his or her right to remain silent to do so unambiguously. A requirement of an unambiguous invocation of *Miranda* rights results in an objective inquiry that "avoid[s] difficulties of proof and . . . provide[s] guidance to officers" on how to proceed in the face of ambiguity. If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression "if they guess wrong." Suppression of a voluntary confession in these circumstances would place a significant burden on society's interest in prosecuting criminal activity.

*Berghuis*, 560 U.S. at 381-82 (alterations in original) (internal citations omitted) (citing *Davis*, 512 U.S. at 458-461; *Moran v. Burbine*, 475 U.S. 412, 427 (1986)).

### 3. *Cesler's Photograph Identification of Bell*

Bell objects to the Magistrate Judge's finding that Cesler's photo identification of Bell was not unduly suggestive. (Def.'s Obj. R&R 2). Specifically, he argues that Cesler witnessed the arrest of Bell prior to identifying him, and that Cesler is not a reliable witness on account of his everyday heroin use and alleged bias. (Def.'s Obj. R&R 2-6).

Pretrial photo identification is inadmissible at trial "if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). The Court should suppress a pretrial identification if: (1) the defendant proves the identification procedure was unduly suggestive and (2) the court is not satisfied that, under the totality of the circumstances, the identification was nevertheless reliable. *Ledbetter v. Edwards*, 35 F.3d 1062, 1071 (6th Cir. 1994). The Supreme Court has instructed courts to assess reliability based on five factors:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Neil v. Biggers*, 409 U.S. 188, 199-200 (1972).

As highlighted by the Magistrate Judge, it is unclear based on the record whether Cesler's photo identification of Bell occurred *before* or *after* Cesler witnessed Bell's arrest. (R&R 9-10). If the identification occurred after Bell's arrest, then Cesler's observation of the arrest itself certainly could have tainted his later identification of Bell. Even so, the Magistrate Judge thoroughly analyzed the circumstances surrounding Cesler's identification of Bell and deemed it reliable. (R&R 11-12). The defense now argues this analysis was incorrect because Cesler was a daily heroin user and "had a bias to curry favor with police." (Def.'s Obj. R&R 4). The Magistrate Judge already considered Cesler's heroin use when making his determination, however,[5] and there is nothing to suggest that Cesler was offered any sort of deal or otherwise pressured by police to cooperate in this investigation. As such, the Magistrate Judge appropriately concluded that Cesler's identification of Bell was reliable under the totality of the circumstances.

B. **Motion for Leave to Seal**

The United States has moved for leave to seal Exhibit B to its response to one of the motions to suppress. (Pl.'s Mot. Leave File Sealed Ex., DN 36). Exhibit B is an audio recording of Bell's post-*Miranda* interview. Because the exhibit contains personally identifying information, the Court will grant the motion.

---

[5] "There may be some question as to Cesler's degree of attentiveness as he admitted to law enforcement that he had been using heroin daily for about a year prior. But this is the only fact that calls Cesler's attentiveness into question and is contradicted by Hayes' testimony that he appeared clear headed." (R&R 10 (internal citations omitted)).

## IV. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows:

1. The Magistrate Judge's Findings of Fact, Conclusions of Law, and Recommendation (DN 45) is **ADOPTED IN PART** and **REJECTED IN PART**.

2. The United States' Objection (DN 49) is **SUSTAINED**.

3. Defendant's Objection (DN 50) is **OVERRULED**.

4. Defendant's Motions to Suppress (DN 33, 34) are **DENIED**.

5. Plaintiff's Motion for Leave to Seal Exhibit (DN 36) is **GRANTED**, and the clerk shall file the exhibit under seal.

Greg N. Stivers, Chief Judge
United States District Court

September 10, 2019

cc: counsel of record